# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CRIMINAL ACTION NO. |
| | § | |
| v. | § | |
| | § | 4:18-CR-00233-10 |
| | § | |
| KYLER STEWARD SISSON | § | |

### SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE

Now comes, Kyler Steward Sisson, Defendant, through counsel and files this Sentencing Memorandum to the assist the court in imposing a just sentence in this case.

**I.    INTRODUCTION**

"It is important...to realize that departures are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some aspects, the rigidity of the Guidelines themselves. District judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." *United States v. Gaskill*, 991 F.2d 82, 86 (3rd Cir. 1993). Defendant, Kyler Steward Sisson, submits this Sentencing Memorandum for the purposes of assisting the Court in fashioning a sentence under 18 U.S.C. § 3553(a) that is, in fact, "sufficient but not greater than necessary to comply with the purposes" of § 3553. Mr. Sisson humble and respectfully requests the court to apply U.S.S.G. § 5H1.11 as a valid ground for a downward departure based on his prior military service and asks the court to consider the physical and mental toll his service in the Marine Corps had on his life, especially with respect to his involvement and role leading up to the arrest in the instant case.

As this Court is aware, its sentencing obligation since the decision in *United States v. Booker*, 125 S.Ct. 738 (2005) is to impose "a sentence sufficient, but not greater than necessary" to comply with the factors set forth in 18 U.S.C. § 3553. The Court must still consider the sentencing guidelines, but under *Booker* the Guidelines are "merely one sentencing factor among many, and the calculated guideline range must be considered in conjunction with the other § 3553(a) factors."[1] The guidelines do not have "quasi-mandatory status."[2] The federal sentencing statute requires a "sentence sufficient, but not greater than necessary" to meet certain goals, including consideration of: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant…(3) the kinds of sentences available…(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense."

To comply with the Fifth Circuit's instructions in *United States v. Mares*, the court should, if it elects to impose a non-guideline sentence:

> "must carefully articulate the reasons [the court] concludes that the sentence [it] has selected is appropriate for that defendant. These reasons should be fact specific and include, for example, aggravating or mitigating circumstances relating to personal characteristics of the defendant, his offense conduct, his criminal history, relevant conduct or other facts specific to the case at hand which led the court to conclude that the sentence imposed was fair and reasonable."[3]

---

[1] *United States v. Reinhart*, 442 F.3d 857, 864 (5th Cir. 2006), cert. denied, 127 S.Ct. 131 (2006) (citing *United States v. Booker*, 125 S.Ct. at 756-757).
[2] *United States v. Reinhart*, 442 F.3d at 864.
[3] *United States v. Mares*, 402 F.3d 511, 519 (5th Cir.), cert. denied, 126 S.Ct. 43 (2005).

This sentencing memorandum will hopefully aid the court in the following ways:

1) Address and apply the factors set forth in 18 U.S.C. § 3553(a), which the Court must consider in determining a particular sentence to impose;
2) Outlines the factors for the basis of a downward departure based on military service, pursuant to under U.S.S.G. § 5H1.11;
3) Includes various characters letter references from friends, family, and colleagues who uniformly praise the good character, kindness to others, dedicated service in the military, and his devotion to family .

## II.   MILITARY SERVICE

Mr. Sisson served in the United States Marine Corps from 2011 until he was honorably discharged in 2015. *See* Presentence Report (the "PSR") at ¶ 55. Mr. Sisson achieved the rank of Lance Corporal, and received the Combat Action Ribbon, the Afghanistan Service Ribbon, and Two Bronze Stars. *See* PSR at ¶¶ 55, 57. He served one tour overseas, and served our country as a machine gunner and a sniper before being medically discharged. *Id.* at ¶ 57. He is 100% disabled based on lung and heart conditions. *Id.*

In his PSR interview, Mr. Sisson mentioned that his addiction to drugs were directly related to nightmares he has when he sleeps from Post-traumatic stress disorder ("PTSD") from serving in the Marine Corps. PTSD is a genuine mental health condition that's triggered by a terrifying event — either by experiencing it or witnessing it. Symptoms may include flashbacks, nightmares and severe anxiety, as well as uncontrollable thoughts about the event.[4] In this case, PTSD was directly related to his overseas combat service in the military. Mr. Sisson described how initially

---

[4] Posttraumatic stress disorder. In: Diagnostic and Statistical Manual of Mental Disorders DSM-5. 5th ed. Arlington, Va.: American Psychiatric Association; 2013. http://www.psychiatryonline.org. Accessed Dec.13, 2016.

he took narcotics to try and avoid sleep and the chronic nightmares that would occur from PTSD attributed to his serving combat duty in the military. *See* PSR at ¶ 49.

### a) U.S.S.G. § 5H1.11

U.S.S.G. § 5H1.11 provides that "military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."[5]

### b) FIFTH CIRCUIT AND SUPREME COURT CASES: THE LAW

Many cases in both the United States Supreme Court and in the United States Court of Appeals for the Fifth Circuit have upheld downward departures for prior military service. *See United States v. Williams*, 332 Fed. Appx. 937 (5th Cir. 2009). Williams pleaded guilty to attempting to commit extortion affecting interstate commerce. Rule 35(a) resentencing adjustment from 188-235 months to 120 months based upon defendant's pre-indictment military service was not unreasonable. *See Williams*. In support of such a departure, the Court noted that "Williams's service to his country is admirable and worthy of consideration as a mitigating factor supporting a downward departure." *Id.*

In *United States v. Peters*, at defendant's sentencing for violating Arms Export Control Act, the district court did not err when declining to depart downward on the basis of defendant's military service which included, among other things, the award of two Purple Heart medals and a Distinguished Flying Cross award.[6] The lower court concluded that defendant's military decorations were insufficiently extraordinary to compel such departure. *Id.*

---

[5] USSG §5H1.11 (Military, Civic, or Public Service; Employment-Related Contributions; Record of Prior Good Works (Policy Statement) (Nov. 1, 2009)).
[6] *United States v. Peters*, 978 F.2d 166 (5th Cir. 1992).

The Supreme Court's opinion in *Porter v. McCullom*, 130 S.Ct. 447 (2009) is instructive and is decidedly in favor of leniency.[7] In *Porter*, the Supreme Court considered the defendant's conviction and death sentence for fatally shooting his former girlfriend and her boyfriend. In holding that the defendant's trial counsel had rendered ineffective assistance by failing to investigate or present mitigating evidence about, among other things, the defendant's military record, the Court described Porter's military record:

> "Petitioner George Porter is a veteran who was both wounded and decorated for his active participation in two major engagements in the Korean War; his combat service unfortunately left him a traumatized, changed man."[8]

The Court observed that, had Porter's counsel been effective in presenting mitigating evidence:

> "the judge and jury would have learned of the 'kind of troubled history we have declared relevant to assessing a defendant's moral culpability.' They would have heard about (1) Porter's heroic military service in two of the most critical – and horrific – battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling."[9]

The Court emphasized the importance of Porter's military service as a mitigating factor, stating:

> "[o]ur Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on the front lines as Porter did. Moreover, the relevance of Porter's extensive combat experience is not only that he served honorably under extreme hardship and gruesome conditions, but also that the jury might find mitigating the intense stress and mental and emotional toll that combat took on Porter."[10]

---

[7] *Porter v. McCollum*, 130 S.Ct. 447 (2009). ("[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances") (quoting *Eddings v. Oklahoma*, 455 U.S. 104 (1982)).
[8] *Porter*, 130 S.Ct at 448.
[9] *Id*. at 454 (quoting *Wiggins v. Smith*, 539 U.S. 510, 535 (2003)).
[10] *Id*. at 454 (citing *Abbott*, The Civil War and the Crime Wave of 1865-70, 1 SOC. SERV. REV. 212, 232-234 (1927) (discussing the movement to pardon or parole prisoners who were veterans of the Civil War); Rosenbaum, The Relationship Between War and Crime in the United States, 30 J. CRIM. L. & C. 722, 733-734 (1940) (describing a 1922 study by the Wisconsin Board of Control that discussed veterans imprisoned in the State and considered "the greater leniency that may be shown to ex-service men in court.").

### c) POST-TRAUMATIC STRESS DISORDER ("PTSD") DEFINED

Symptoms of PTSD can include re-experiencing the traumatic event in the form of nightmares or flashbacks, numbing of feelings and emotional withdrawal from others, hypervigilance, and irritability that can quickly evolve into anger and rage that is excessive for the circumstances. Consequently, PTSD sufferers may experience problems in their interpersonal relationships. Because many service personnel and their family members may be confronted with the effects of PTSD, explanations for laypeople are readily available. The National Institute of Mental Health provides this catch-call definition, that can be but may not necessarily be applied to those suffering from PTSD…"PTSD is an anxiety disorder that some people get after seeing or living through a dangerous event. When in danger, it's natural to feel afraid. This fear triggers many split-second changes in the body to prepare to defend against the danger or to avoid it. This "fight or flight" response is a healthy reaction meant to protect a person from harm. But in PTSD, this reaction is changed or damaged. People who have PTSD may feel stressed or frightened even when they're no longer in danger."[11]

Surveys of service military personnel reveal some of the circumstances that contribute to the development of PTSD from combat duty may include: "being attacked or ambushed, . . . being shot at or receiving small arms fire, . . . seeing dead bodies or human remains, . . . knowing someone else seriously injured or killed, . . . seeing ill or injured women or children whom they were unable to help, . . . [having] a buddy shot or hit who was near them, . . . and engaging in hand-to-hand combat."[12]

---

[11] National Institute of Mental Health, What is Post-Traumatic Stress Disorder, or PTSD http://www.nimh.nih.gov/health/publications/post-traumatic-stress-disorder-ptsd/what-is-post-traumatic-stressdisorder-or-ptsd.shtml, viewed November 21, 2011.

[12] Don Nidiffer and Spencer Leach, *To Hell and Back: Evolution of Combat-Related Stress Disorder*, 29 DEV. MENTAL HEALTH L. 1, 11-12 (January, 2010) (citing Hoge, et al, *Combat Duty in Iraq and Afghanistan, Mental Health Problems, and Barriers to Care*, NEW ENG. J. OF MED., 351, 13-22 (2004)).

### d) EFFECTS OF DEPLOYMENT

Deployment to combat arenas involves stressors that add to the risk of psychological problems. In the case of the Afghanistan and Iraq combat arenas, for example, these stressors include "130 degree temperatures, unrelenting noise, lack of privacy, and the constant threat of being attacked by mortar rounds, rocket propelled grenades, or biological and chemical agents" as well as unsanitary living conditions.[13] For service personnel everywhere, rates of emotional problems increase with repeated deployments.[14] While away, service members may worry about their employment prospects after deployment.[15] They may also worry about a spouse left at home, who must deal with children's behavior issues that arise when one parent is deployed.[16] Even service members deployed to non-combat zones can face significant stressors. A study of several thousand troops deployed as peacekeepers to Somalia showed that they experienced stress from "frustration with the rules of engagement, such as exercising restraint in dangerous situations; demoralization; hostility and anger; and witnessing death and violence."[17]

---

[13] AMERICAN PSYCHOLOGICAL ASSOCIATION PRESIDENTIAL TASK FORCE ON MILITARY DEPLOYMENT SERVICES FOR YOUTH, FAMILIES AND SERVICE MEMBERS, THE PSYCHOLOGICAL NEEDS OF U.S. MILITARY SERVICE MEMBERS AND THEIR FAMILIES: A PRELIMINARY REPORT, at 4, 9 (February 2007).
[14] *Id.* at 21.
[15] INST. OF MEDICINE OF THE NAT'L ACAD., GULF WAR AND HEALTH, VOL. 6: PHYSIOLOGIC, PSYCHOLOGIC, AND PSYCHOSOCIAL EFFECTS OF DEPLOYMENT-RELATED STRESS 2, 13(2008).
[16] *Id.*
[17] *Id.*

  e)  **MILITARY COMBAT SERVICE EXPERIENCE & MENTAL HEALTH**

The stress of military service and combat experience can affect the health of service personnel. Researchers have documented the relationship between military service and such conditions as Post Traumatic Stress Syndrome (PTSD), anxiety and depressive disorders, and substance abuse.[18] A study of nearly 3,000 Iraq War veterans found killing in combat "a significant predictor of PTSD symptoms and alcohol abuse . . . suggesting that taking a life in combat is a potent ingredient in the development of mental health difficulties." The authors note that killing "was also a significant predictor of . . . anger and relationship difficulties."[19] Another study suggests that service personnel with "higher levels of exposure to violent combat, who had killed another person" were more likely to engage in risky behaviors, which may include excessive alcohol use, use of illicit drugs, and aggressive driving.[20] Army mental health officials have found that among personnel deployed to Afghanistan and Iraq, lengthy deployments, multiple redeployments, and little "down time" between deployments contributed directly to development of mental health conditions.[21]

---

[18] INST. OF MEDICINE OF THE NAT'L ACAD., GULF WAR AND HEALTH, VOL. 6: PHYSIOLOGIC, PSYCHOLOGIC, AND PSYCHOSOCIAL EFFECTS OF DEPLOYMENT-RELATED STRESS 2 (2008).

[19] Shira Maguen, Barara A. Lucenko, Mark A. Reger, Gregory A. Gahm, Brett T. Litz, Karen H. Seal, Sara J. Knight, and Charles R. Marmar, *The Impact of Reported Direct and Indirect Killing on Mental Health Symptoms in Iraq War Veterans*, 23:1 J. OF TRAUMATIC STRESS, 86 (February 2010).

[20] William D.S. Killgore, Dave I. Cotting, Jeffrey L. Thomas, Anthony L. Cox, Dennis McGurk, Alexander H. Vo, Carl A. Castro & Charles W. Hoge, *Post-combat Invincibility: Violent Combat Experiences Are Associated with Increased Risk-Taking Propensity Following Deployment*, 42(13) J. OF PSYCHIATRIC RESEARCH 1112 (Oct. 2008).

[21] THE CENTER FOR MENTAL HEALTH SERVICE'S GAINS CENTER, U.S. DEPT. OF HEALTH AND HUMAN SERVICES, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, RESPONDING TO THE NEEDS OF JUSTICEINVOLVED COMBAT VETERANS WITH SERVICE-RELATED TRAUMA AND MENTAL HEALTH CONDITIONS: A CONSENSUS REPORT OF THE CMHS NATIONAL GAINS CENTER'S FORUM ON COMBAT VETERANS, TRAUMA, AND THE JUSTICE SYSTEM (August 2008), available at: http://gainscenter.samhsa.gov/text/veterans/Responding_to_Needs_8_08.asp (reviewed September 13, 2010).

Courts have often considered the impact military service has on the individual before the court; sometimes courts impose more lenient sentences when, in the court's view, the defendant suffers from a mental or emotional condition that is traceable to the defendant's military service. Courts will continue to confront the issues related to PTSD, TBI, and other effects of military service, as well as how to appropriately recognize one's service to one's country. As the knowledge of the physical, mental, and social effects of military service continues to evolve, it will be important to be aware of current developments in the medical establishment.

In the instant case, there is no doubt that Mr. Sisson suffers from PTSD related to his military service, as well as other physical health issues that led to his successful discharge from the Marine Corps. However, as noted in the PSR, a discharge summary from Fletcher Counseling and Associates in Plano, Texas, indicated Mr. Sisson had night terrors related to combat Post Traumatic Stress Disorder (PTSD), which resulted in defendant using methamphetamine so he could prolong not going to sleep. *See* PSR at ¶ 49. This was also confirmed by his close friend, Jonnell Neel, who is his third-party party custodian, the VA Hospital determined Mr. Sisson had 60% PTSD. *See* PSR at ¶ 49.

Thus, he initially started using illegal narcotics to avoid sleep because of recurring nightmares. This fear of sleep and the frequent nightmares led to this addiction and provides the framework for how Mr. Sisson first got involved with drug use, etc. His military service record and the aftermath of being in combat led to PTSD, which in turn led to him trying to find an outlet to try and circumvent the stress and the inability to sleep without persistent nightmares. In sum, his prior use of illegal drugs can be solely traced back to his service in the military, the trauma he went through, the inability to cope with such trauma when he came home, which eventually led to the coping mechanism of drug use to try to avoid PTSD related episodes for him.

**III.     APPLYING FACTORS OF 18 U.S.C. § 3553(a) TO KYLER STEWARD SISSON**

As noted above, this Court must impose "a sentence sufficient, but not greater than necessary" to comply with the factors set forth in 18 U.S.C. § 3553. Of course, in making this determination, a court may not presume that a guideline sentence is a correct one. *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.").

**1)     Nature and Circumstances of the Offense and the History and Characteristics of Kyler Steward Sisson –**

   *a) Nature and Circumstance of the Offense*

Mr. Sisson was charged in this case with a non-violent offense, and it has never been proffered that he has any proclivity for violence or aggression. After his military service, he found himself in a situation where he became addicted to illegal narcotics, and subsequently became involved as a middle-man for the sale and distribution of the substance.

   *b) History and Characteristics of the Defendant*

Mr. Sisson has never been convicted of a criminal offense, and his role in this conspiracy was mainly as the middle-man between the main supplier and buyers. In fact, when the search warrant was executed of the residence in this case, Mr. Sisson was not even present. Mr. Sisson is also a Veteran of the United States Military and was honorably discharged for medical reasons beyond his control. He has been on pre-trial supervision release while this case is pending and has complied with all terms and conditions associated with being free on bond. There have been no violations or allegations that he has not been compliant with all conditions of his release after his arrest.

Mr. Sisson had a troubled childhood, as noted in paragraph 49 of the PSR, and believed serving in the military would be his way to be a productive person and United States citizen. He is a loving father to his daughter and has done everything possible and within his power to be an upstanding citizen since being discharged from the military, and also subsequent to the arrest in the instant case, having no encounters with law enforcement or infractions while this case has been pending and he has remained free of custody. He also has worked hard to be a loving and devoted father, despite circumstances which exist that have made it difficult for him. Nonetheless, he has done all asked and required of him since the arrest in this case and while free on bond. He also has zero criminal history points, and other than this instant offense, has no other convictions for criminal offenses on his criminal legal record. *See* PSR at ¶ 34.

In addition, the Court has before it a number of letters from diverse persons, who uniformly praise the character of Mr. Sisson, his kindness to others and his devotion to his family (*See* Attached Exhibit A). The letter writers, most of which are signed and notarized, some typed and some handwritten, from his closest family members and friends, most of whom have known Kyler Steward Sisson his entire life. They paint a different picture of the usual defendant in a case like this. Instead, it is clear that Mr. Sisson had trouble upon his honorable discharge from the military, made the mistake of using illegal drugs to try and cope with PTSD from serving in our military, but is now working to get his life back on track.

**2)** **The Need for the Sentence Imposed:** *Seriousness of the Offense, Promote Respect for the Law, Deterrence, Just Punishment, Protection of the Public, and Rehabilitation –*

The seriousness of the offense is discussed above, and Mr. Sisson has shown he has accepted responsibility and will not recidivate if given a future opportunity to success.  Regarding respect for the law, just punishment and protection of the public, Mr. Sisson has paid dearly for

his crimes as outlined above, and life will never be the same for him regardless of the sentence imposed. He will no doubt come before the Court for Sentencing a much different person than the individual who committed the offense for which he will be sentenced.

As far as rehabilitation, he has had no infractions while this case is pending and while out on bond and would freely engage in any rehabilitate activities deemed required, especially in relation to his physical and mental medical condition from his military service. Lengthy medical records with various military doctors set forth Mr. Sisson's complete medical condition for physical injuries sustained during his service, hereto is attached as Exhibit B.

Of course, Mr. Sisson need for adequate medical care, for both his physical disability he suffered while in the military, and also all mental conditions (such as PTSD) from serving combat duty in the Marines. It goes without saying that Mr. Sisson may not be given the requisite medical care for both his physical and mental conditions while in federal custody caused by trauma related to his combat service overseas, and as such, he likely will not be able to have access to proper medical personnel wherever he may be sent to serve his sentence. Thus, as a result, his rehabilitation will be severely impeded, if not totally stunted, if now he will have to serve a lengthy prison sentence. In sum, Defendant Kyler Sisson respectfully requests the court to make a determination to support how any of these considerations dictate a downward departure in the instance case, and a lengthy prison sentence would not benefit society, nor would it help Mr. Sisson lead a productive life after he serves whatever sentence is imposed in this case.

3) **To Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner** –

As stated previously, Mr. Sisson needs specialized and specific medical care for both his physical and medical (mental) conditions that arose from his military service. He would not receive

proper care if incarcerated and could receive such attention from a VA Hospital that are tailored to meet such needs.

4) **The Kind of Sentences Available (3-6); The Advisory Guideline Range; Any Pertinent Policy Statements Issued by the Sentencing Commission; and The Need to Avoid Unwarranted Sentence Disparities** –

As discussed above, while the Court must consider the advisory guideline range, it cannot be presumed that such a range provides reasonable and just punishment. *Nelson*, 555 U.S. at 352. Moreover, as also discussed above, there are strong indications that the advisory guideline range does *not* provide a reasonable and just punishment for someone similarly situated, and for an individual so detrimentally impacted during the service to our country. It certainly does not provide reasonable and just punishment in this case given the nature of the offense, the background of Mr. Sisson, and the extremely small likelihood that he would reoffend.

## IV. CONCLUSION

Mr. Sisson and by and through undersigned counsel respectfully request a downward departure in this case due to the myriad of mitigating factors to be considered. Such a downward departure a would be appropriate here, with possibly conditions related to counseling for Mr. Sisson in connection with his physical and mental medical condition, especially as it relates to any PTSD he has or is suffering from. Such mitigating factors that exist here warrant a downward departure, and would serve as "a sentence sufficient, but not greater than necessary" to comply with the factors set forth in 18 U.S.C. § 3553.

As discussed above and which is corroborated in his PSR outlining his medical conditions, both physical and mental disabilities directly related to service in the United States military, dictate there are multiple grounds which alone, or in combination, support a downward departure. Such a departure will allow Mr. Sisson to obtain the extensive medical attention he requires, and it will

allow Mr. Sisson to continue caring for his daughter and his own disabilities in proper fashion. Additionally, it will conserve the resources of the Bureau of Prisons in that the Bureau of Prisons will not have to undertake to provide Mr. Sisson the extensive medical attention he unquestionably needs.

Counsel prays that after weighing the 18 U.S.C. § 3553 factors in this case, the court will conclude that a sentence that contemplates a downward departure from the advisory guideline range listed in the PSR, especially given how his military service to our country and the personal and emotional toll it took on his physical and mental health, is indeed warranted. While allowed to be free of custody while on bond in this case, Mr. Sisson has been compliant in every possible way. Given his background in the military and the underlying reason for how he initially got involved in the instant offense arose from trying to cope with nightmares from PTSD, assuming he is monitored closely in the community, and making sure the type of treatment and counseling needed for Mr. Sisson will aid his disabilities, which undoubtedly would not be of the type offered in the Bureau of Prisons, a downward departure is warranted. For the foregoing reasons, defense counsel submits that the Court should depart downward from the advisory guideline range listed in the PSR. Such a sentence combined with whatever conditions the Court deems just and proper is "sufficient, but not greater than necessary" to impose just punishment on Kyler Steward Sisson.

Respectfully submitted,

*Carl D. Ceder*

Carl David Ceder
Attorney For Kyler Steward Sisson
Texas State Bar License: 24062657
Carl@CederLaw.com
701 East 15th Street, Suite 101
Plano, Texas 75074
Telephone:    (469) 900-0000
Facsimile:    (214) 206-9395
**BOARD CERTIFIED – CRIMINAL LAW**
**TEXAS BOARD OF LEGAL SPECIALIZATION**

## **CERTIFICATE OF SERVICE**

      I hereby certify that on January 27, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following CM/ECF participants:

                                              _/s/ *Carl D. Ceder*_
                                              Carl David Ceder

| | |
|---|---|
| **Maureen Smith,** | **Maureen.Smith@usdoj.gov** |
| **Robert Lopez,** | **Robert_Lopez@txep.uscourts.gov** |

      I hereby certify that on January 27, 2021, I caused a true and correct copy of the foregoing notice to the following parties were served via e-mail and via the Court's ECF filing system to all counsel of record in this matter.

Assistant U.S. Attorney Maureen Smith
600 East Taylor Suite 2000
Sherman, TX 75090
903.868.9454
Maureen.Smith@usdoj.gov

Robert Lopez
U. S. Probation Officer
Sherman, TX
903.209.4206
Robert_Lopez@txep.uscourts.gov